Daniel, J.
The action in this ease was brought against the plaintiff in érr.or to recover of him the sum of five hundred dollars, the penalty imposed by the first section of the act passed the 17th of March 1856, entitled “ an-act providing additional protection for the slave property of the citizens of this commonwealth.” The judgment was rendered on a special verdict in which the jury find “that the defendant, (the plaintiff here), a citizen of Massachusetts, did on the 4th of August, 1856, then being the captain and owner of the schooner JVymphus O. Hall, owned in part by citizens of Massachusetts, leave the waters of Virginia, with said schooner, for a port north of and beyond the capes of Virginia, without having first obtained a certificate of inspection as required by the provisions of the statute;” and if the court shall be of opinion that said statute is not in conflict with the constitution of the United States or the bill of rights and constitution of Virginia, and is a law governing in such cases, then the jury find for the plaintiff (in the action) the smn of five hundred dollars with interest from the 4th of August 1856, and costs, &c.; but if the court shall be of opinion,-that said statute is in violation of the constitution of the United States, or the constitution and Bill of Bights of Virginia, then they find for the defendant.
In the petition for the supersedeas and in the argument here, it is urged that the statute in question is in conflict with several of the provisions of the constitution of the United States—and, first, with the third clause of the eighth section of the first article, declaring that Congress shall have power “ to regulate commerce *191 ■with foreign nations and among the several states and with the Indian tribes.”
The provisions of the statute which, it is supposed, bear more immediately upon this question as well as the other questions raised in the case, are to be found in the first, second, fourth, fifth, sixth, eighth, eleventh, twelfth and sixteenth sections.
By the first section it is enacted that it shall not be lawful for any vessel, of any size or description whatever, owned, in whole or in part, by any citizen or resident of another state, and about to sail or steam from any port or place in this state, for any port or place north of and beyond the capes of Virginia, to depart from the waters of this commonwealth until said vessel has undergone the inspection provided for in the fourth section and received a certificate to that effect. If any such vessel shall depart from this state without suqh certificate of inspection the captain or owner shall forfeit and pay the sum of five hundred dollars; to be recovered by any person who will sue for the same in any court of record in this state, in the name of the governor of the commonwealth. Pending said siiit the vessel of such captain or owner is not to leave the state until bond be given by the captain or owner, or other person for him, payable to the governer, with sureties,, in the penalty of one thousand dollars, for the payment of the forfeit or fine and costs; and in default of such bond the vessel shall be held liable; and there is a proviso that the section is not to apply to vessels belonging to the United States government, or vessels American or foreign, bound direct for any foreign country, otheT than the British North American Colonies,
The second section constitutes the pilots licensed under the laws of Virginia, inspectors to execute the act. By the fourth section it is' made the duty of such inspectors to examine and search the vessels mentioned in *192 the first section, to see that no slave, or person held to service or labor in this state, or person charged with the commission of any crime within the state, shall be concealed on board said vessel. The inspection is to be made within twelve hours of the time of the departure of the .vessel from the waters of Virginia, and may be made in any bay, river, creek or other water course of the state; provided, however, that steamers plying as regular packets between ports in Virginia and those north of and .outside of the capes of Virginia, shall be inspected at the port of departure nearest to Old Point Comfort.
The fifth section directs, that a vessel so inspected and getting under weigh with intent to leave the waters of the state, if she returns to an' anchorage above Back river point or within Old Point Comfort shall be again inspected as if an original case; if however, such vesvel be driven back by stress of weather to seek a harbor she is to be exempt from payment of a second fee unless she holds intercourse with the shore. .
By the sixth section the inspector is directed, after searching the vessel, if he sees no cause to detain her, to give to the’ captain a certificate to that effect: if, however, upon such inspection, or in any other manner, any slave or person held to service or any person charged with crime is found secreted on board of any vessel, or any vessel is detected in violating the provisions of this act, it is made the duty of the inspector to attach the vessel and arrest the person on board to be delivered up to the sheriff or sergeant of the nearest port in the commonwealth to be dealt with according to law.
The eighth séction allows to the inspector a fee of five dollars for every inspection under the act, except inspections of vessels engaged in the coal trade, the fee for which is two dollars—and declares the vessel liable for its payment.
*193 The eleventh section forbids any pilot, under a penalty of fifty dollars, from piloting, out of the jurisdiction ■of the state, any vessel which is required to be inspected and which has not obtained and exhibited to him the certificate of inspection.
The twelfth section authorizes the courts of the several counties and corporations situated on the Chesapeake bay or its tributaries, by an order entered of record to appoint as many inspectors at such places within their inspection districts as they may deem necessary, to prevent the escape, or for the recapture, of slaves attempting to escape beyond the limits of the state, and to search or otherwise examine all vessels trading to such counties and corporations; the expenses in such cases to be provided for by a levy on negroes now taxed by law; but no inspection by county or corporation officers thus appointed is to supersede the inspection, by pilots, provided for in the act.
The sixteenth section directs that the fines and forfeitures except such portions as are otherwise provided for in other sections of the act, shall be paid into the treasury of the state, to constitute a fund to be called “ the fugitive slave fund” and to be used for the payment of rewards awarded by the governor for the apprehesion of runaway slaves, and to pay the expenses incident to the execution of the statute, and for such other purposes as may be hereafter determined on by the general assembly.
It is proper to add that by the ninth and tenth sections, provisions are made for rewarding any inspector who shall apprehend a slave in the act of escaping on board a vessel trading to or belonging to a non-slavehokling state, and for punishing any inspector who, for the want of proper exertion or by neglect in the discharge of his duties, shall permit a slave to escape. It is proper too to observe further that during the same ses *194 sion of the legislature at which the act under consideration was passed (indeed on the same day of the session) two other acts were passed, the one an act to amend the Code so as more effectually to prevent the- escape of slaves, and the other an act to increase the rewards for the arrest of runaway slaves. By the provisions of the former of these two acts, any free person who carries or causes-to be carried out of any county or corporation any slave without the consent of his owner, or who shall attempt to' carry off or aid or connive at orbe in any way concerned in the escape of any slave, with intent to defraud or deprive the owner of such slave, is liable, on conviction to be confined in the penitentiary and to forfeit to the owner double the value of the slave; and if the person so offending is at the time in command of or attached! to a vessel, the vessel is to be forfeited to the commonwealth : any master of a vessel trading to or bound beyond the limits of the state having a slave on board without the written consent of the owner and going with him beyond the limits of any county, and any free person traveling by land who shall aid any slave to escape out of any county are to be considered as carrying off such slave within the meaning of the foregoing provisions. The master or shipper of any vessel who knowingly receives on board, any runaway slave and permits him to remain on board without proper- effort, is liable to penalties of a like character, and if such slave be on board snob vessel after leaving port, the master or skipper shall be presumed to have knowingly received him. And if a free person advise any slave to abscond from his master or aid such slave to abscond by procuring for, or delivering to him, a pass, register or other writing or furnishing him money, cloths, provisions or other facility, or be in any manner accessory to tbe escape or attempt to escape of such slave he is also punishable therefor by confinement in the penitentiary.
*195 No one can, I think, read the act in question in connexion with the provisions of the two other statutes just mentioned, and other acts of a like character to he found in our Code and Sessions Acts, without coining to the conclusion that the act was framed with no view to the regulation of commerce, and with no design to interfere with its regulation by Congress; but that its real object and design was as its title declares, to provide additional protection for the slave property of the citizens of the commonwealth; that it forms a part of a system of police measures adopted by the legislature in the honest effort to suppress and prevent the escape and abduction of our slaves.
Such being the avowed and manifest design of the act, it is difficult to understand the argument that would place it in conflict with the provisions of the constitution in question, even allowing, to the word commerce, tiie most comprehensive meaning that has been given to it, and, to the grant, of power over the subject, to Congress, the most liberal construction that has been adopted in any judicial decision brought to our notice. In no one of the numerous cases cited at the bar, in the course of the extended argument here, have I been able to find any ruling or dictum which would exempt private vessels, their masters or crews—the instruments and agents of commerce—whilst within the jurisdiction of a state, from the operation of its laws passed with a view to the restraint and pnnisliment of offences against the persons or property of its eitizens. On the contrary in nearly all of these cases, in which the validity of state laws have been disputed on the' ground of their alleged conflict with the clause of the constitution in question, it has been assumed on the one hand and conceded on the other, that the laws of a state passed in the exercise of its reserved powers over its internal police, if not paramount to any mere regulation of commerce by Congress, are *196 yet not to be denied tlieir full force and efficacy in any cases other than those where the law of the state and the law of Congress are so directly and- vitally opposed to each other that they can not he reconciled or consistentIy stand together. The law under consideration, as I understand it, stand's opposed to no decision made or opinion pronounced in any one of the cases of Gibbons v. Ogden, 9 Wheat R. 1 ; Brown v. State of Maryland 12 Id. 419; or the cases of Smith v. Turner, and Norris v. The City of Boston; The Passenger Cases, 7 How. U. S. R. 283. So far from it, in the concessions made by the judges who concurred in these decisions, and1 more especially in the concessions made by the judges constituting the majority of the court, in the Passenger-Cases, is to be found the admission of every principle necessary to the vindication of the law under consideration against the allegation of its being in conflict with the constitutional power of Congress over the subject of commerce. Thus in the case of Smith v. Turner, Mr, Justice McLean at p, 400, (7 How.) says, “in giving the commercial power to Congress the states did not part with that power of self preservation which must be inherent in every organized community. They may guard against the introduction of anything which may corrupt the morals or endanger tire health or lives of their citizens.” Again at page 402, whilst denying that a-state can regulate foreign commerce he says, “'it may yet do many things which more or less affect it. It may tax a ship or other vessel used in commerce the same as other property owed by its- citizens. A state may tax the stages in which the mail is transported, but this does not regulate the conveyance of the mail any more than taxing the ship regulates commerce. And yet in both instances the tax on the property in some degree affects its use.”. In the conclusion of his opinion in Norris v. City of Boston, p. 410, he observer; “ Under the firs# *197 and second sections of the act the persons appointed may go on hoard of a ship from a foreign port which arrives at the port of Boston with alien passengers on board and examine whether any of them are lunatics, idiots, maimed, aged or infirm, incompetent to maintain themselves, or have been paupers in any other country, and. not permit such persons to be put on shore unless security shall be given tliat they shall not become a city, town or state charge. This is the exercise of an unquestionable power in tlie state to protect itself from foreign paupers and other persons who would be a public charge.” Mr. Justice Grier, in the eourse of his opinion in the last mentioned case, at p. 457, remarks: “ It must he borne in mind that the controversy in this case is not with regard to the right claimed by the State of Mass&chussetts, in the second section of tlie act, to repel from her shores, lunatics, idiots, criminals or paupers which any foreign country or even one of her sister states might endeavor to thrust upon her; nor tlie right of any state whose domestic security might he endangered by the admission of free negroes, to exclude them from her borders. This right of tlie states has its foundation in the sacred law of self-defence, which no power granted to Congress can restrain or annul. It is admitted by all that those powers which relate to merely municipal legislation, or what may be more properly called internal police, are not surrendered or restrained; and that it is as competent and necessary for a state to provide precautionary measures against the moral pestilence of paupers, vagabonds and convicts, as it is to guard against the physical pestilence which may arise from unsound and infectious articles imported.” And Mr. Justice Wayne, at p. 426, says: “When Congress shall legislate—if it be not disrespectful for one who is a member of the judiciary to suppose so absurd a thing of another department of this government, to make paupers, *198 vagabonds, suspected persons and fugitives from justice, subjects of admission into the United States, I do not doubt it will be found and declared, should it ever become a matter for judicial decision, that such persons are not within the regulating power which the United States have over commerce. Paupers, vagabonds and fugitives never have been subjects of rightful national intercourse, or of commercial regulations, except in the transportation of them to distant colonies to get rid of them, or for punishment as convicts. They have no rights of national intercourse; no one has a right to transport them without authority of law from where they are to any other place; and their only rights, where they may be, are such as the law gives to all men who have not altogether forfeited its protection.” For a fuller statement of these principles, reference may be made to the opinion of Mr. Justice Barbour in the'case of The City of New York v. Miln, 11 Peters R. 139-141, and to the opinions of Mr. Justice Woodbury and Mr. Justice Grier in The License Cases, 5 How. U. S. R., 628-632. In the last mentioned ease Mr. Justice Grier concludes his opinion with the following observations: “ It has been frequently decided by this court ‘that the powers which relate to merely municipal regulations, or which may be more properly called internal police, are not surrendered by the states or restrained by the constitution of the United States; and that consequently in relation to these the authority of a state is complete, unqualified and conclusive.’ Without attempting to define what are the peculiar subjects or limits of this power, it may safely be affirmed that every law for the restraint and punishment of crime, for the preservation of the public peace, health and morals, must come within the category. As subjects of legislation they are, from their very nature, of primary importance; they lie at the foundation of social existence; they are for the protection of life and *199 liberty, and necessarily compel all laws on subjects of secondary importance which, relate only to property, convenience or luxury, to recede when they come in conflict or collision; sains popnli sn/prema lex. If the right to control these subjects be ‘complete, unqualified and exclusive’ in the state legislatures no regulations of secondary importance can supersede or restrain their operations on any ground of prerogative or supremacy. The exigences of the social compact require that such laws he executed above all others. It is for this reason that quarantine laws which protect the public health, .compel mere commercial regulations to submit to their control. They restrain the liberty of the passengers, they operate on the ship which is the instrument of commerce and its officers and erew, the .agents of navigation ; they seize the infected cargo and cast it overboard. The soldier and the sailor, though in the service «of the government, are arrested, imprisoned and punished for their offences against society. Paupers and convicts are refused .admission into the country. All these things are done not from any power which the states assume to regulate commerce or to interfere with the regulations of commerce, but because police laws for the preservation of health, prevention -of crime and protection of the public welfare, must of necessity have full and free operation according to the exigency which requires their interference.”
It is true that there is .a conflict between some of these views and portions of the opinion of Chief Justice Taney in the same ease, which it would seem proper to notice. In commenting on the ease of Gibbons v. Ogden at p. 582, he observes: “It is admitted by the court, in that case, that a state may, in the execution of its police and health laws, make regulations of commerce, but which Congress may control. It is very clear that so far as .these regulations are merely internal and do not *200 °Pera^e'on foreign commerce, or commerce among the states, they are altogether independent of the power of the general government, and cannot be controlled by it. ^ie Power °f control therefrom which the court speaks of, presupposes that they are regulations of foreign commerce, or commerce1 among the states. And if a state,, with a view to its police or health may make valid regulations of' commerce which yet fall' within the controlling power of the general government, it follows that the state is not absolutely prohibited from making regulations of foreign commerce within its own territorial limits, provided they do not come in conflict with the-laws of Congress. It has been said indeed, that quarantine and health laws are passed by the States, not by virtue of a power to regulate commerce, but by virtue of their police1 powers,, and in order to guard the health and lives of their citizens. This,.however, cannot be said of the pilot laws, which are yet admitted to be equally valid. But what are the police powers of a State? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And' whether a State passes a quarantine law or a law to punish offences, or to establish courts of Justice,, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the- same power; that is to say, the power of sovereignty, the- power to govern men and things within the limits of its dominion. It is by virtue of this power that i't legislates- and' its authority to make regulations of commerce is as- absolute as its power to pass health laws except in so far as it has been restricted by the constitution of the United States. And when the validity of a state law making- regulations of commerce is drawn into- question in a Judicial tribunal, the1 authority to pass it cannot be made to depend upon the-motives that may be.- supposed! to have influenced the *201 legislature, nor can tlie court enquire whether it was intended to guard the citizens of the State from pestilence and disease, or to make regulations of commerce for the interests and convenience of trade.” lie then proceeds however, more fully in support of the proposition, which he was seeking to establish, and in reference to which the foregoing remarks were made, to insist, that the grant of power to Congress to regulate foreign commerce is not of itself a prohibition to the States, but that the States have still the right to make and enforce regulations of the subject for their own territory subject only to the restriction that they do not conflict with some law of Congress.
It is proper also to observe that, in the recent case of Sinnot v. Davenport & al., 22 How. U. S. R. 243, (which will be again referred to,) Mr. Justice Melson, in delivering the opinion of the Supreme court, in answer to an argument, that the act whose validity was in question, was but the exercise of a police power, and hence, if the act should be found in conflict with a law of Congress regulating commerce, it should still be regarded as a valid act and as excepted out of, and from, the commercial power, fully concurs in the views of Judge Taney on the subject. “The nullity of any act inconsistent with the constitution,” (he observes) “is produced by the declaration that the constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties is to such acts of the State legislature as do not transcend their powers, but though enacted in the execution of acknowledged State powers, interfere with or are contrary to the laws of Congress, made in pursuance of the constitution, or some treaty made under the authority of the United States. In every such case the act of Congress or treaty is supreme; and the law of the State, though enacted in the exercise of powers not controverted must *202 He-*d He makes, however, this important addr tion: “We agree, that in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together; and also that the act of Congress should have been passed in the exercise of a clear power under the constitution.” In this connexion it is further to be considered, that the Supreme court in the case of Cooley v. Board of Wardens of Port of Philadelphia, 12 How. U. S. R. 299, have decided that though the pilot laws are regulations of navigation, and therefore of commerce, and by consequence within the grant to Congress of the commercial power, yet that this power in respect to such laws, is not exclusive ; and that the • laws of the States on the subject are constitutional and valid.
This being settled, in the view which I take of the law under consideration, it is not material to the settlement of this case, whether we adopt the views of those judges of the Supreme court who hold that health laws and other regulations of police passed by the State, must prevail in any conflict with regulations of commerce by Congress, or concur with judge Taney and the other members of the court entertaining the like sentiments, in holding that the police laws of the State are to have full sway and efficacy over all matters within the jurisdiction of the State until they be found in direct and fatal antagonism to some regulation of commerce, by Congress. For placing the act in question upon the footing on which the plaintiff in error would place it, to wit, of a commercial regulation, it would, for the most obvious reasons, be entitled to the entire benefit of tlie main reasoning upon which Mr.- Justice Curtis, who delivered the decision in the case just cited, rested the validity of the pilot laws; which was, that, from their very *203 nature it was not necessary tliat they should be uniform, but on the contrary, they demanded a diversity which could alone meet the varying local necessities of navigation ; and consequently that the subject was one likely to be best provided for, not by one system or plan of regulations to be adopted by Congress, but by as many as the legislative discretion of the several States should deem applicable to the local peculiarities of the ports within their limits. If we could view this act then as a regulation of commerce or navigation passed to prevent vessels from becoming instrumental in the escape of slaves, the same plea of a local necessity for the passage of the law in question sustains it. The property which it seeks to protect is of a peculiar character confined to a minority of the States of the Union ; the laws necessary for its protection in one State would be wholly inapplicable to another State.
And in this connexion it maybe asked, with what regulation of commerce by Congress does the law in question conflict that the pilot laws in the case last cited did not conflict with ? It was said in the' course of the argument, that it conflicts with the laws of Congress regulating the enrolment and licensing of vessels' for the coasting trade. In this case there is no proof that the vessel in question had a coasting license; the special verdict is silent on that subject. But waiving that defect in the case, there is a ready answer to the objection to be found in the case just cited.' In that case it was admitted that the Consul, one of the vessels of which the pilotage was demanded, was engaged in the coasting trade, sailing under a coasting license of the United States, and was bound from the port of Philadelphia in the State of Pennsylvania to the port of New York in the State of New York. Yet those facts were decided to be of no force.
It is obvious that the decisions in none of the cases *204 jet cited, bear immediately on the question before us, though they relate to subjects of a kindred character.'—■ They were, however, made the subject of a very full examination at the bar, and I have felt it my duty to refer to them, and have, I think, shown that the opinion cmd reasonings, of the judges in those cases, so far as they bear on this case, instead of warranting any'doubt as to the validity of the law in question, tend strongly to the establishment of its constitutionality. This law cannot be likened to the law of Alabama which was pronounced unconstitutional by the Supreme court in the case of Sinnot v. Davenport, 22 How. U. S. R. 227, already cited. The law there required the owners of steamboats navigating the waters of the State, before such boat should leave the waters of Mobile, to file a statement in writing in the office of the probate judge of Mobile county setting forth—first the name of the vessel; second the name of the owner or owners; third, his or their place or places of residence; fourth, the interest of each in the vessel. That law was held to be in conflict with the act of Congress passed 1793 (See Brightley’s Digest, Coasting Trade 140, § 7.) so far as it bore upon a coasting vessel which had taken out a coasting license and was duly enrolled under the law of Congress for carrying on the coasting trade, and plied between New Orleans and the cities of Montgomery and Wetumpka in Alabama. The ground of the decision was that the enrolment prescribed by the act of Congress required the owner or owners to furnish, under oath, to the collectors all the information required by the State law, and which is incorporated in the bpdy of the enrolment; that Congress therefore had legislated on the very subject which the State law undertook to regulate and had limited its regulation in the matter to a registry at the home ports.
I will now proceed to notice briefly the particulars in which, it is contended, the law conflicts with the clause *205 of the constitution in question—or interferes in any man- . . , . » , . . ner with the operations of commerce, or sub] ects it to any improper burden. The objectionable features of the laiv in this aspect, as is said, are those which direct the search of the vessel, and exact a fee to the pilot or inspector for making the search; and those which forfeit the vessel and direct its seizure and the arrest of those on board, if found violating the laws of the State in any of the particulars mentioned in the act.
In respect to the last objection the case of Smith v. The State of Maryland, 18 How, U. S. R. 71 is, as I conceive, directly in point. In that case a vessel which was enrolled and licensed for the coasting trade was seized condemned and forfeited, by proceedings, in the State courts of Maryland, for a violation of an act of that State passed to prevent the destruction of oysters in the waters within the jurisdiction of that State. The Supreme court of the United States, without dissent, sustained the judgment. In delivering the opinion of the court, Mr. Justice Curtis held that the laws of Congress for the enrolment and licensing of vessels conferred no immunity, from the operation of the valid laws of a State; that where a vessel so licensed engaged in commerce between the States is interrupted therein by a law of a State, the question arises whether the State had power to pass the law by force of which the voyage was interrupted; that if it should be found as in Gibbons v. Ogden, that the State had not power to make the law-under which a vessel of the United States was prevented from prosecuting its voyage, then the prevention would be unlawful, and the proceedings under the law invalid. But that a State might make valid laws for the seizure of vessels of the United States—such among others as quarantine and health laws; that the State of Maryland had a right to pass laws for the protection of oysters, and the punishment of those who should destroy them by the *206 means interdicted in tlie act; that to inflict a forfeiture of a vessel on account of tlie misconduct of those on board, treating the vessel as liable to forfeiture because the instrument of the offence, is within established principles of legislation which have been applied by most civilized governments; and tliat.it was within the legislative power of the State to interrupt the voyage and inflict the forfeiture of a vessel enrolled and licensed under the laws of tlie United States for a disobedience, by those on board, of the commands of such a law.
It can require no argument to show that this State has a right to pass laws to prevent the escape of its slaves, and to punish all who may aid them in tlie effort to escape. Indeed the right to pass such laws and to subject to forfeiture vessels which shall be made the instruments of their violation, is entirely free from seeming- difficulties that were plausibly said to lie in the way of the Maryland law. So much of tlie law therefore as seeks to interrupt the voyage of a vessel and forfeit it when found in the actual violation of our laws, is free from the objection under consideration. Had' the appellant or his vessel been detected in the actual violation of our laws there is no regulation of commerce, which he could have relied on to exempt his person from arrest, or his vessel from seizure and forfeiture.
And I apprehend it is clear that the right of a State to pass laws for the prevention of crimes against the property of its citizens, is just as well recognized as its right to inflict punishment for such crimes when actually committed. And it would seem to follow as a necessary corollary, that if the penalties for actual violations of the laws may properly reach to, and interfere with the operations of commerce, all just precautionary measures adopted with a view to the prevention or .detection of such violations, must have the like force and virtue.
In the case of The City of New York v. Miln, 11 *207 Peters R. 102, already cited, this proposition was treated by Mr. Justice Barbour, in delivering his opinion, as one free from all dispute. “Bo one will deny (lie says) that a State has a right to punish any individual found within its jurisdiction who shall have committed an offence against its criminal laws. We speak not here of foreign Ambassadors as to whom the doctrines of public law apply. We suppose it to be equally clear that a State has as much right to guard by anticipation against the commission of an offence against its laws, as to inflict punishment upon the offender after it shall have been committed.” For a fuller statement of the law in this respect I refer to the opinion. The passage cited bears immediately on the question in hand. Unless then the preventive measures of this law, of which, the search is the one most seriously objected to, come in conflict with some other provision of the constitution of the United States or some provision of our own Bill of Bights and constitution, the mere fact that it causes the temporary detention of vessels employed as vehicles of commerce, on their voyage, is of no weight as an objection to the validity of the law.
The law, it is said by the counsel of the appellant, is in conflict with the spirit of the fourth article of the amendments of the constitution of the United States, which declares that the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrants shall issue but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized; and more especially in conflict with the Bill of Bights of Yirginia, which declares that general warrants whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not *208 named, or whose offence is not particularly described, and supported by evidence, are grievous and oppressive and ought not to be granted. It is sufficient to say, in respect to the first branch of the objection, that the clause of the constitution of the United States in question is in restraint only of process issued under the laws of the United States, and has no application whatever to the laws of the States or proceedings under them. This has been repeatedly decided by the Supreme court. Smith v. State of Maryland, 18 How. U. S. R. 71, and cases there cited. In passing’ upon the question whether the law violates our Bill of Rights, I do not deem it necessary to consider a preliminary question much discussed at the bar, to wit, whether the restraints of the section in question were restraints only on the judiciary in the exercise of its powers, or also extended to the legislature. Conceding for argument’s sake that its restraining influence was designed to extend over all the departments of the government, I have not been able to bring my mind to see that it can affect such a law as the one under consideration. The power of search which is given by this law is derived from that quasi maritime power or police over the waters of'the State visited by vessels engaged in commerce which is inherent to the sovereignty of every State, and has never been surrendered by Virginia to Congress—certainly never given exclusively to Congress. The Bill of Rights is intended to protect the citizens in their persons and houses from unreasonable search; 'but surely it could never have been within the meaning of the founders of our government, by this clause, to strip the State of 03ie of those powers essential to the protection of the State, and one which is claimed and exercised by all nations, viz: that of ascertaining the character, purposes and intentions of all vessels visiting its ports; of seeing that they are not made the vehicles of bringing disease or crime into the *209 State, or in oilier respects made the instruments of vioa .. ., , iiating its laws.
It is essential to the safety of every nation-that it should have the power, not only to seize and forfeit if necessan .... J -, . , . a*y, vessels visiting its waters, and to punish the persons •controlling and navigating them, for breaches of its local regulations, but also to impose upon them sncli restraints as are necessary to prevent them from violating Its laws. The fourth article of the amendments of the •constitution of the United States has never been regarded by Congress, I believe, as denying to it the full exercise of this right. Such -a power has been always •deemed essential t© the protection of the customs and •the full execution of the revenue laws, as wall be seen by a reference to the history of our federal legislation. Tlius, in the laws on the coasting trade, Brightley’s Digest 148, § 41, it is declared “to be lawful for any officer of flie revenue to go on board of any ship or vessel whether •the same shall he within or without his district, and ■the same to inspect, search and examine -, and if it shall ■appear that any breach of the laws of the United States has been committed, whereby said ship or vessel, or the goods, wares -and merchandise on hoard, or any part thereof is or are liable to forfeiture, to make seizure.”— I am not aware that there has been any question -as to the constitutionality of these provisions; and they have been in force from 1793. So again in the laws on imports and exports, Brightiey p. 410, § 388, passed in 1799, it is enacted that “every naval officer, collector and surveyor, or other person specially appointed by them for the purpose, shall have full power and authority to enter any ship or vessel in which they shall have reason to suspect any goods, wares or merchandise subject to duty ■are concealed, and therein to search for, seize and secure any such goods, wares or merchandise; and if they shall have cause to suspect a concealment thereof in any *210 particular dwelling-house, store, building or other plaeey they or either of them, shall upon proper application, on oath, to any justice of the peace he entitled to a warrant to enter such- house-, store or other- place (in the day time-only,) and there to search for such goods ;■ and if any shall be found to- seize and secure the same for trial y and all such, goods, wares and merchandise on- which the duties shall not have been paid or secured to he pa.id, shall he forfeited.” Here we find the principle in question; most distinctly and emphatically recognized and asserted ; the right to search the vessels being, placed- in contrast with the right to search the houses, stores, &c.—Ho oath is made necessary as a pre-requisite to the search of the former,, whilst it is to the search of the latter.
From the very nature of the- mischief, of wlficli the-law under consideration was intended as a remedy, to-wit, the concealment, carrying away and escape of persons on board of vessels in the very act of leaving the waters, and departing from the j urisdiction of the State,, the law would be of little worth or efficacy if no search could he made except upon warrants founded upon oath of probable cause-, &c. The fact of the flighty or effort to escape, or of the aid given, or facility afforded,, by the vessel would, in all probability, be rarely known or suspected till the escap>e had been effected. In the absence of such precautionary measures the vessel would, in most instances, be beyond the jurisdiction of the State, and the property of the citizen lost, before the slow process of the law could reach the offending vessel or its master.
But it is said that the exaction of the fee for the search is unconstitutional—that it violates the- second clause of the 10th section, article 1 of the constitution, -which prohibits any State without the consent of Congress, from laying any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws. A complete answer to this objection *211 is to be found in tlie case of Cooley v. Board of Wardens of the Port of Philadelphia, and the Passenger cases. At p. 814, of tlie first mentioned case, Mr. Justice Curtis says: “This provision of the constitution was intended to operate upon subjects actually existing and well understood when the constitution was formed. Imposts and duties on imports and exports and tonnage were then known to the commerce of a civilized world to be as distinct from fees and charges for pilotage, and from the penalties by which commercial States enforced their pilot laws, as they were from the charges for wharfage of towage or other local port charges for services rendered to vessels or cargoes; and to declare that such pilot fees or penalties are embraced within the words imposts'or duties on imports, exports or tonnage would be to confound things essentially different and which must have been known to be essentially different by those who used the language.” And in the Passenger cases, Mr. Justice Wayne, in making a summary of what he understood to be the several propositions intended to be decided by the majority of the court in those cases, states at p. 415, (T Howard,) as the 9th of those points or propositions, that the States may, in the exercise of their police powers, enact quarantine and health laws, and may exact from the owner or consignee of a quarantined vessel and Horn tlie passengers on board o£ her, such fees as will pay to tlie State the cost of their detention and of the purification of the vessel, cargo and apparel of the persons on board. The whole question, then, as to the fee, is, as I conceive, determined in settling the previous question. When the inspection of the vessel is once shown to fall within the legitimate functions of a police regulation the right to demand the foe for making the search, according to these authorities, follows as a necessary consequence.
Two other objections to the law remain to be consid *212 ered : First—that it is in opposition to the second section of the fourth article of the constitution, which declares that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States; and secondly—that it conflicts with the sixth clause of -the 7th section of the 1st article of the constitution declaring that, no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another—nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties to another.
Is the law open to the first of these objections ? It is contended that it is in this, that it subjects the vessels of citizens of other States, to charges and burthens from which the vessels of the citizens of our own State are exempted. The language of the law out of which the question arises, is, “it shall not he lawful for any vessel of any size or description whatever, owned in whole or in part by any citizen or resident of another State, and about to sail or steam from any port”, &c.
In proceeding to enquire into the force of the objection the first step is the ascertainment of the sense in which the words citizen and resident viere used by tbe legislature.
In the case of Gassiss v. Ballow, 6 Peters R. 761, it was held by Chief J. Marshall, that a citizen of the United States residing in any State of the Union is a citizen of that State. There are other casesof the Supreme court to the same effect. And in Towle's case, 5 Leigh 743,, the General court of this State decided that a naturalized citizen of the United States or a native citizen of any other State of the union domiciled in Virginia, being entitled to all tbe privileges of a citizen of this State, is a citizen of Virginia; and by the- Code of 1849, p. 61, it is declared, that all free white persons horn in the State, all free white persons horn in any other State of *213 this union, who may he or become residents of this State, all aliens being free white persons naturalized under the laws of the United States, who may be or become resídents of this State, &c., shall be deemed citizens of this State. And by the 3rd section of the same chapter, p. 63, it is declared that any citizen of the State being twenty-one years of age, who shall reside elsewhere and in good faith become the citizen of some other State of this union or the citizen or subject of a foreign State, shall not, while the citizen or subject of another State or sovereign, be deemed a citizen of this State. The second section of the chapter provides a mode (to wit by deed in writing, &c.) by which a citizen of the State may declare his purpose to relinquish his character of a citizen, and on his adopting that mode and departing from the State, the section declares that he shall he considered as having exercised his right of expatriation so far as regards this State and shall thenceforth he deemed no citizen thereof. A citizen of another State of the Union thus becomes a citizen of this State by residing in the State, and a citizen of Virginia may cease to he such by becoming the citizen of another State or country, or by expatriation. Construing the law in question in reference to the foregoing decisions and legislative provisions, it is obvious that the words “citizen or resident” in their present collocation cannot, without interpolating into the statute other words, give expression to the true meaning and purpose of the legislature, if we give to the word resident any one of the senses in which it is ordinarily understood. For if we suppose that by the use of the word is meant one temporarily sojourning in another State of the Union with no purpose of making it his permanent domicil, then the vessel of a citizen of Virginia, domiciliated in Virginia hut sojourning in another State, might he subject to the burthen; whilst a ship owned a former citizen of the State who had expatriated him *214 self or indeed by a foreigner neither a citizen nor a res" ident of any State of the Union, would be exempted from the burthen; and if we understand the word as meaning one permanently residing in and domiciliated in another State though not a citizen thereof, then a foreigner, not a resident, of any one of the United States, or if so, having but a temporary residence, might be exempted ; whilst a native Virginian who by domiciliation had become a citizen of another State of the Union would be liable to have his vessel subjected to the search on the score of his being a citizen of such last mentioned State. And if this word resident is treated as a mere synonym of “citizen” then there would be a discrimination in favor of foreigners against native Virginians, who had expatriated themselves from the State, or who were merely sojourning in any other of the United States, without having abandoned their domicil in Virginia, or who were domiciliated in any foreign country, without having yet become citizens thereof. The purpose of the legislature manifestly was to provide that vessels owned by persons wanting in a certain relation to the State of Virginia should be liable to the examination provided for in the statute, and in the effort to designate and describe them they have adopted the indirect and awkward method of indicating such persons by the relation they have to other States. The words employed for the purpose, as they are now connected, (it has been seen) without some-additions and explanations, so far from conveying the sense intended, lead to manifest absurdities; but by transposing the words and giving them an immediate connection with and reference to this State, they, admit, without any additional words, and without any other change of phraseology than the simple conversion of or into and, of a reasonable interpretation, and declare, as I conceive, the true meaning of the legislature, to wit, that vessels owned by any other persons than the citi *215 sens and residents of this State—citizens of Virginia— •permanently residing—domiciliated in the State, shall be liable to the search. Under this interpretation of the law a citizen of Virginia who has abandoned ills domici'l, but who has not become a citizen of any other of the United States, nor formally expatriated himself—as also a citizen of Virginia domiciliated in a foreign-State but not yet become a citizen of that State, and so still a citizen of Virginia, would be subject to the regulation alike with all other persons not domiciled in Virginia whether citizens of this State or other States of the Union.
Let ns now proceed to consider briefly wliat is the nature of the privileges and immunities of citizenship to which the constitution entitles the citizens of each 'State in every other State. The language is broad—universal—-“all the privileges and immunities”; yet it is clear that such is not the true meaning of the constitution.— It could not have been the design of the framers of the constitution to declare that a State may not allow to its residents—its inhabitants—some privileges which it may deny to the residents and inhabitants -of other'States. We have no 'authoritative expositions of this clause -of the constitution giving us -a full 'and complete definition of its terms; though, it has Leen, I think, clearly shown that they must be received in a qualified and restricted sense. Thus in the case of Campbell v. Morris, 3 Har, & McH. 585, 554, judge Chase says—“By taking a retrospective view of our situation antecedent to the formation of the first general government or the confederation in which the same clause is inserted, verbatim, one of the great objects must occur to every person; which was the enabling- the citizens of tire several States to acquire and hold real property in any of the States—and deemed necessary as each State was a sovereign and independent State, and the States had confederated only for ¿he purposes of general -defence and .security, -.and fio *216 promote the general welfare. It seems agreed from-the-manner of expounding or defining the words immunities and privileges by the counsel on. both sides, that a particular and limited, operation is to be given to these-words, and. not a full and. comprehensive- one-. It is-agreed it does not mean, the light of election, the right of holding office, the right of being elected " The court are of opinion, it means that the citizens of all the States-shall have the peculiar advantage- of acquiring and holding real as well as personal property, and that such property shall be-protected and secured, by the-laws of the State in the same manner as the- property of the citizen of the State- is protected. It means such property shall not be liable to any taxes or burdens wliich the property of the citizen is not subject to-. It secures and. protects personal rights.” lie added that “a restriction of the power of the-State legislatures to establish modes of proceeding for the recovery of debts is not to be inferred from the clause- under consideration.” In that case the-words of the law whose- constitutionality was questioned are—“If any person, whatsoever not being a citizen of this State and not residing therein, shall or may be-indebted unto a citizen of this State, or of any other of the United- States, or if any citizen of this State being-indebted to another citizen thereof shall actually runaway, abscond, or fiy from, justice, or secretly remove from his place of abode with the intent to evade the payment ©f his or her just debts, such creditor may in, either case-make application, &c., for an- attachment,” &c-.
It was argued that the statute- put the- citizen- of another State on- a worse footing than the citizens of the-State- of Maryland; as by its provisions an attachment could not issue* against a* citizen of that State- unless he-was absconding or departing with a design to defraud! His creditors, whereas in the case- of a citizen of another State it was only necessary to show that he lived out of *217 file State, and without any default or fraud on his part he was liable to be proceeded against. But the objection was without avail, and the validity of the law was sustained by the court. See also Ward v. Morris, 4 Harris & McII. 330, in which a decision was made to the like effect. See also Corfield v. Coryell, 4 Wash. C. R. 370.
Like differences between the modes of proceeding* against the citizens or residents of other States and the modes of proceeding against their own citizens or inhabitants will he found in the laws of most of the States ; and I know of no decision in which it has been hold that, by such discriminations, the citizens of such other States are deprived of any of their rightful privileges and immunities. A like discrimination is made in our own laws and, I presume, in the laws of other States in demanding of the resident of another State seeking to enforce by suit a demand against a resident of this State, that he give security for the payment to his adversary of the costs of the suit in case he is cast in his suit; not only so, but that he also secure to the officers of the law the fees for the services they may he required to render him in the discharge of their respective duties—whilst a resident of the State is free to prosecute his suit without giving such security.
In neither of these instances can it he said that the non-resident is deprived of any of the immunities of citizenship, in the sense contemplated in the constitution; he is held ultimately responsible for nothing that he would not have to meet were he a resident citizen of the State; though his responsibilities are enforced in a mode differing from that adopted in the case of the citizen of the State; a difference justified by the difference in the relative situations of the two parties. The presence of the person of the citizen and liis consequent immediate amenability to the process of the court justly exempts him from *218 a proceeding in tlie one instance and a demand for security in the other, that are deemed just and necessary in the ease of the non-resident who is beyond the reach of the ordinary process of the law.
The principle exhibited in the foregoing illustrations admits, obviously, of a further extension. Whilst all the property in the State, whether owned by its own citizens or the citizens of other States, is entitled to its protection, the State has an undoubted right to see that no property within its limits and jurisdiction by whomsoever owned becomes the source of annoyance to the community or of danger to the lives or peace or property of its citizens. It would seem equally just that, when any species of property whether from its peculiar situation or other cause, though that cause he the absence or non-residence of the owner, becomes the source of peculiar or extraordinary danger to the community, the State should have the right to adopt such regulations of police and set on foot such measures of vigilance as it may in its wisdom deem best calculated to guard against the threatened mischief. There is no injustice in subjecting the property of one class of citizens of the State to stricter regulations than those applied to the like property of another class of citizens of the State, if the discrimination is founded in a stronger necessity for rigor in the one case than in the other; nor is there any injustice in adopting a greater degree of vigilance in respect to the property of citizens of other States than is observed in respect to the like property owned by citizens of this State if there is greater danger, or reasonable grounds for the apprehension of greater danger to the safety of t}ie public from the presence of such property in the one case than in the other.
It will be agreed too, I conceive, that in passing upon the law under consideration, respect for the legislature, nay sheer justice to that body, requires of us, that we *219 give it credit for fair and reasonable dealing; that we are to take it for granted that the legislature has fairly endeavored to adapt the provisions of the law to the end avowedly sought to be accomplished; that under the pretext of providing a better protection to the slave property of the State, the legislature has not contemplated the sinister purpose of conferring upon the resident citizens of this State undue advantages over the citizens of the other States.
Is there, then, no good reason for the discrimination, objected to?—no just ground for the search of vessels owned by the citizens of other States, or by our own citizens who have abandoned their residence in Virginia, which does not apply with equal force to vessels owned by the resident citizens of the State ?
We have seen by a reference to the laws on the subject, that they not only subject to seizure and forfeiture any vessels which may be used as instruments for aiding in the escape of slaves, and. visit with severe penalties all masters of vessels who may aid any slave to escape, but also extend to all persons who by affording any facility or otherwise “shall be in any manner accessory to the escape or attempt to escape of such slaves.”
In the absence of a right to search the departing vessels of non-resident owners have we under these laws as complete a protection against them as is afforded in the case of resident owners ? To my mind it is obvious that we have not. In the case of vessels owned by resident citizens, we have in their residence and amenability to the process of our courts, a safeguard against their knowingly allowing their vessels to be used as instruments or facilities to aid in tlié escape of slaves which we cannot have against the owners of vessels residing beyond our jurisdiction; as to the latter the provisions of the statute in respect to the accessory to the offence are without sanction or force; beyond the reach of the law its de *220 nnnciations, as to them, are comparatively, without its terrors. It is true that in respect to the forfeiture and loss of the vessels, in casé of detection, the resident and non-resident owners are under the influence of the like motives to dissuade and deter them from embarking in any criminal enterprise of the kind. But in respect of personal responsibility the two classes of owners stand on wholly different and unequal footings: A difference arising out of the very circumstance of residence in the one case and non-residence in the other. The resident uses his property—his vessel—under a sense of personal accountability for a violation of the law-—the fear of an infamous punishment; a powerful restraining influence which, if not wholly inoperative in the case of the non resident must, from the very nature of things, act upon him with a far slighter degree of force. The law therefore, as it seems to me, is not necessarily obnoxious to the charge of injustice or partiality because of its requiring a measure of vigilance to be observed in respect to the vessels of non-residents, in the act of leaving the State, from which the vessels of resident citizens are exempted. The law makes no distinction between the resident and non-resident in respect to the penalties attached to its violation. In each case the vessel is liable to seizure and forfeiture; and this, without regard to the innocence or complicity of the owner wherever he may reside. The measure of corporal punishment with which it seeks to visit the owner who is in any manner accessory to the commission of an offence, is in both cases the same. The difference in its treatment of the two classes of owners of vessels consists in ' its adopting a measure of preventive justice in respect to The vessel of the nonresident, which it dispenses with in the case of the vessel of the resident owner. This difference is perfectly consistent with the promptings and movements of an even handed justice. It does not necessarily imply the *221 indulgence by the legislature of feelings of special jealousy or suspicion towards the citizens of other States.— The law does not impute, necessarily, to the citizens of other States a depravity or proneness to the commission of crime of which it acquits the citizens of this State; hut proceeding npon well known motives of human conduct, it does suppose that in the residence of the latter, within the reach of our laws, and in their sense of personal accountability for a breach of the law, which consequently arises out of their situation, there is a check and restraint upon their conduct which is wholly wanting, at least does 5iot operate in a like degree, in the ease of the non-resident. The law seeks to compensate for this difference; and in the effort avails itself of the only means within its reach. By the employment of an increased vigilance in respect to the movements of his vessel, the non-resident owner is brought under an influence which the denunciations of corporal chastisement would, for the reasons already stated in his case, he powerless to establish. By the exposure of his vessel to the greater hazard of forfeiture and loss, by means of the search, his sense of fear is quickened, and he is thus restrained from becoming an accessory to any scheme by which his vessel would he made an instrument of offence against the law. Such is, I conceive, the theory upon which the discrimination in question is founded; and the law is thus in my judgment acquitted of any injustice to the citizens of other States.
The force of this view is not impaired by the consideration that the law institutes the search as well in respect to vessels owned in part, as to those owned in whole, by persons oilier than resident citizens. If the search was required only in the case where the vessel was wholly owned by non-residents, the legislature might well apprehend that persons residing out of the State and disposed to aid in the escape of slaves through the instru *222 mentality of their vessels, would seek to associate with themselves in the ownership of the vessels, persons residing in the State, and thus elude the provisions of the ^aw' subjecting to the search vessels owned by nonresidents either in whole or in part, the legislature has sought to extend an additional restraining influence over all, interested to any extent in the ownership of the vessel, who by reason of their non-residence do not stand on the same footing of personal accountability with the resident owners of vessels.
I And nothing in the case of Chapman v. Miller, 2 Spears R. 769, decided by the Supreme court of South Carolina, in conflict with these views. In that case in which the validity of an ordinance to regulate the pilot-age of Charleston was brought in question, vessels “wholly owned in that State” were exempted from fees of pilotage to the payment of which all other vessels were subjected. There was nothing, in the nature of the subject nor in the provisions of the law, to show any call for such a discrimination. As was said by the Judge— Butler—who delivered the opinion of the court, “thefact that coasting vessels are entirely owned in South Carolina can give their masters no better knowledge of the harbor of Charleston than masters of other coasters who have been engaged in the same trade, and who are therefore equally acquainted with the navigation. Bor it might be that a vessel owned in Massachusetts might be navigated by a master born in Charleston; and, vice versa, that a vessel owned in Charleston might be navigated by a Boston master; the circumstance of ownership can make no difference.” And hence he argued that the discrimination was not founded in any real difference in the situation of the owners, and was unjust and in violation of the true meaning and spirit of the constitution; and the law was declared invalid.
Bor do I regard the case of Wiley v. Parmer, 14 *223 Alab. R. 627, as furnishing any authority or argument against the constitutionality of the law. On the contrary the concessions made by the judges in delivering their opinions, go to sustain the right of the State to make the discrimination in question. Tire question there was as to the constitutionality of a statute which enacted that there should be assessed and collected on all slaves in the State, the property of non-residents, a tax of two dollars; whilst, at the time, the tax upon the slaves of citizens resident in the State was only one-half of that sum. The court held that the law was in conflict with the clause of the constitution under consideration. Chilton J. after citing the clause and adverting to the supposed objects of the framers of the constitution in making it, observed:
“This section of the law imposes a tax—a tax upon the slaves of non-residents, double that imposed by the then existing law upon the slaves of resident citizens, not for the purpose of enforcing any duty or obligatiou on the part of the owner or master with respect to the slaves; not with a view of protection to the State against any evil resulting from the situation of the property, hut as was shown by the title of the act, simply for “the purpose of raising an additional amount of revenue to support the State government and to maintain the faith and credit of the State of Alabama,” be sa,id, however, further, that he wished it distinctly understood, that he did not deny the power of the State to.enact whatever laws might be necessary to promote the peace and domestic-interests of its citizens, and such police regulations as might he deemed necessary to protect or control this peculiar species of property. This power was reserved by the States as essential to their existence and well being as separate communities, while such powers only were conferred upon the general government as affect those interests common to all the States considered as a confederate nation. If the slaves of a non-resident should *224 be turned loose upon tlie community without the coir trol or guidance of their owner, lie did not doubt that the State possessed the most ample power to adopt police regulations as would effectually remedy the evil. But the law, he said, did not proceed on any such views. It did not demand the tax for any extra diligence or new measure of police arising out of the owner living apart from liis slaves, or from his withholding his personal control and superintendence. Collier, Chief J. concurred fully, and in concluding his opinion said, “Slaves, it must be conceded, are. a unique and peculiar description of propertyand that it is competent for the legislature to enact regulations of police in respect to them which may discriminate between tlie resident and 3ion-resident master. These measures of police may be so framed as to subject the non-resident to heavier pecuniary burdens.” But it was not necessary, lie added, to say more on tliat head, as tlie statute was plainly intended to raise a revenue, and not to regúlale to any extent the police of the State.
The case of Redd v. St. Francis county 17 Arkansas R. 416, affords, as I conceive, strong persuasive authority against the objection to tlie law under consideration. In that case tlie law of which the constitutionality was assailed, required that all lauds belonging to non-residents should be valued by three householders of the election township within which the lands are situate, to be appointed by tlie sheriff; and such valuation, provided it were not'less than three dollars per acre, should govern the sheriff in assessing the same. It was' urged, against the law that it placed tlie non-resident on a different footing from that on which the resident citizens were placed in respeGt to the assessment of their taxable property; the general law upon the subject requiring that the assessor should require each person to give in a list of his taxable property, and that the assessor or slier *225 iff should make out a schedule of the property so given in by each person and its value; and when thus made •out it should be sworn to by the person or his agent, as being the full amount of property owned by him subject to taxation, together with the true value thereof; provided that no land shall be v-alued at less than three dollars. The court held that the provision objected to did not violate the second section of the fourth article of the constitution. They said that it did not follow that, because the legislature had directed one mode to be pursued for the ascertainment of the value of taxable property owned by residents, and another mode for the ascertainment of the value of such property when owned by non-residents, (though such difference might in some extreme cases work a prejudice to the non-resident,) the latter were deprived of any immunity or privilege guaranteed by the constitution; that the requirement of the general law was inconvenient and burdensome to the non-resident, because its observance would require him to have an agent in each county of the State in which he might own taxable property, who should have a personal knowledge not only of the kind of property owned by his principal, but from personal knowledge should be able to swear to its actual and intrinsic value; and was insecure and unsatisfactory to the State for the reason that it was confiding to an individual who might not be supposed to be informed fully on the subject, the assessment of the value of the property of others, and who from corruption or ignorance might place too high an estimate on such property, or else value it so loiv as to defraud the State.out of its legitimate revenue; and that the law did not make any unjust discrimination in favor of citizens or impose burdens on the citizens of other States from which it exempted the citizens of that State.
1 regard the case as fully sustaining the general proposition, that when in the regulation of any subject of in *226 ternal police, a regard to justice and the due and convenient enforcement of its laws requires a State to adopt a different mode of proceeding, or a modification of the regulation, in respect to persons residing out of the State, in order fairly to meet and provide for the circumstance of their non-residence, the competency of the State so to act is not taken away by the clause of the . constitution in question.
Does the act in any manner conflict with the sixth clause of the ninth section of the first article of the constitution?
Dor a history of this clause of the constitution and a statement of the objects contemplated by it I refer to the opinion of Mr. Justice Nelson in the case of the Wheeling Bridge, 18 How. U. S. R. 432-3-4-5. “Apprehensions (lie says) were entertained by some that under the power to regulate commerce Congress might favor ports of-particular States by requiring vessels destined to other States to enter and clear at the ports of the favored ones, as a vessel bound for Baltimore to enter and clear at Norfolk.” “The rights of the States were secured by the exemption of vessels from the necessity of entering or paying duties in the ports of any-State other than that to which they were bound, or to obtain a clearance from any port other than at the home port or that from which they sailed; and also by the provision that no preference should be given by any regulation of commerce or revenue to the ports of one State over those of another.”—“The history of the provision as well as its language looks-to a prohibition against granting privileges or immunities to vessels entering or clearing from the ports of one State over those of another; that these privileges and immunities, whatever they may be in the judgment of Congress, shall be common and equal in all the States. Thus much is undoubtedly embraced in the prohibition; and it may also certainly embrace any other description *227 of legislation looking to a direct privilege or preference of the ports of any particular State over those of another. Indeed the clause seems to import a prohibition against some positive legislation by Congress to this effeet, and not against any incidental advantages that might possibly result from the legislation of Congress upon other subjects connected with commerce and expressly within its power.”
It is obvious that the clause in question contemplates a restriction upon the powers of Congress, and not a restriction upon the legislation of the States in the regulation of their internal police. It is true that if a State under the pretext of a police regulation, should seek to make a discrimination without cause in favor of the ports of one State over those of another, there might be ■room for the argument that it was in fact regulating commerce, and regulating it in a manner forbidden to Congress. But does a mere fact that in a la*w relating clearly to a matter within the competency of the police power of the State, a regulation is found in respect to vessels hound to or from the ports of one or more States, from which, vessels bound to or from the ports of other States, are exempted, furnish necessarily, any ground for such an objection ? The well established validity of ■quarantine laws, in which such discriminations are made, presents a ready and decisive answer to the question.— The power to adapt, such laws to the necessities which call them into existence is not in any manner restrained by the clause of the constitution under consideration.— It would, I apprehend, he no cause of objection to a regulation of the kind that it applied only to vessels coming from certain ports, or was unlimited -as to the period of its operation, if considerations of public safety rendered it proper that it should he so. If danger to the public health should always or generally attend, or be apprehended, from the arrival of vessels coming from certain *228 ports, regulations fairly made to meet the case and guará against the danger could not be set aside and annulled upon the ground that they did not embrace vessels coming from tbe ports of other States. No preference, in any proper sense of the word, could be said to be given to thejast mentioned ports.
The same principle is, it seems to me, applicable to tbe law we are now examining. If tbe legislature bad just ground for apprehending a greater danger of the escape of slaves by means of vessels about to depart for ports or places north of the capes of Yirginia than by means of vessels bound in other directions there was no necessary partiality or injustice in requiring a search of the vessels in the former case and dispensing with it in the latter. There is no provision of the constitution, fairly construed, which would require the legislature, for the mere sake- of a seeming uniformity, but at the sacrifice of substantial justice, either to forego a necessary measure of protection or else to subject to tbe search vessels from which it apprehended no danger, or none in its judgment rendering a search necessary. As to the existence of the state of facts supposed there can, I apprehend, be no question. That there is a greater difficulty in recapturing and reclaiming slaves escaping to the non-slaveholding States of the North than attends the recovery of such as escape to the slaveholding States of the South, is a fact generally known—a matter of undisputed, well authenticated public knowledge. That fugitive slaves and persons aiding them in attempts to escape would therefore seek to avail themselves of vessels bound in tbe former direction rather than those bound in the latter, as affording facilities for making good such attempts, and that, lienee, there would probably be a greater danger that vessels destined to northern ports would become the instruments of escape, might well be regarded by the legislature as matters of fair and proper *229 inference: and that the legislature has framed the law „ in reference to the foregoing state of facts and the supposed requirements of public safety arising out of it, is I think, apparent as well from the provisions of the pariicular act in question as from those of the other laws passed at the same time, and especially from the provision offering special rewards for the arrest and restoration to their owners of slaves escaping to non-slaveholding States. The search is required in the case of a vessel bound north not merely because of its being so bound, but because by reason of such destination the danger of attempted escapes through the instrumentality of the vessel is enhanced. The discrimination proceeds upon no preference of the ships or ports of one State over those of another, but upon motives of State necessity, actually existing or fairly supposed to exist, in the judgment of the legislature. Entertaining such views of the objects contemplated by the law, and of the reasons on which it is founded, I have been unable to discover that any of its provisions conflict with the prohibitions or restrictions of either our State or federal constitution. And I am for afflrming the judgment.
The other judges concurred in the opinion of Dahiel J.
JUDGMENT AbEIEMED.